**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20580,<br><br>                              Petitioner,<br><br>*v.*<br><br>**STEPHEN K. BANNON**<br>210 A Street, N.E.<br>Washington, D.C. 20002,<br><br>                              Respondent. | Misc. Case No.<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION OF THE FEDERAL TRADE COMMISSION FOR AN ORDER ENFORCING CIVIL INVESTIGATIVE DEMAND**<br><br>***REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED TEMPORARILY UNDER SEAL*** |

## INTRODUCTION

The Federal Trade Commission ("Commission") seeks an order requiring Respondent, Stephen K. Bannon ("Bannon"), to appear for an investigational hearing in compliance with a Civil Investigative Demand ("CID") the Commission issued to him on September 24, 2019.  The Commission is investigating whether Bannon, formerly an officer of Cambridge Analytica, LLC, violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, in connection with Cambridge Analytica's operation of a deceptive scheme that improperly harvested Facebook user profile information of tens of millions of American consumers.[1]

Bannon raised no objection to the CID, including the demand for his testimony at an investigational hearing—which was first scheduled for March 11, 2020, but postponed due to concerns related to the COVID-19 pandemic to September 29, 2020 (at Bannon's counsel's

---

[1] All references to "Pet. Ex." are to exhibits attached to Petition of the Federal Trade Commission for an Order Enforcing Civil Investigative Demand filed concurrently herewith.

insistence, an in-person hearing). When the time came, however, Bannon refused to appear. He claims that his recent indictment on unrelated money laundering and fraud charges associated with the alleged misuse of charitable donations entitles him to disregard the Commission's CID because he has a Fifth Amendment right not to incriminate himself.

Bannon's attempt to stall the Commission's investigation is unjustified and should not be countenanced. Courts have long recognized that a witness, like Bannon, cannot refuse to attend a deposition under a blanket assertion of the Fifth Amendment. Accordingly, this Court should grant the Commission's Petition and order Bannon to comply with the CID by appearing—either in-person or remotely via videoconference—for an investigational hearing before Commission staff.

## JURISDICTION AND VENUE

The FTC Act empowers the Commission to issue CIDs—a type of administrative subpoena—to "any person [who] . . . may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57b-1(c)(1). If a CID recipient fails to comply, the Commission may petition the district court "in which such person resides, is found, or transacts business" for an order enforcing the CID. 15 U.S.C. § 57b-1(e). Bannon resides, is found, and/or transacts business in the District of Columbia. Because Bannon has failed to comply in full with the Commission's CID, this Court is empowered to issue an order directing Bannon to show cause why the Court should not grant the instant Petition and to enter its own order enforcing the CID and requiring Bannon to appear at an investigational hearing.

## FACTUAL BACKGROUND

### A.   The Commission's Administrative Action Against Cambridge Analytica For Its Improper Collection Of Personally Identifiable Facebook Profile Data Through Deceptive Means

Cambridge Analytica—which is now defunct—previously operated as a data analytics and

consulting company that provided voter profiling and marketing services for political campaigns and commercial clients. *Cambridge Analytica, LLC*, Docket No. 9389, 2019 WL 6724446, at *2-*3 (FTC Nov. 25, 2019). In 2014, Cambridge Analytica launched a software application on the Facebook platform—called the "GSRApp"—to collect Facebook data and predict users' personality traits that could then be used for micro-targeting and marketing purposes. *Id.* at *3-*5.

The Commission opened an investigation of Cambridge Analytica following public reports in March 2018 that the company had improperly obtained personally identifiable Facebook data for tens of millions of American consumers. In July 2019, the Commission filed an administrative complaint against Cambridge Analytica. In November 2019, following a motion for summary judgment, the Commission determined that Cambridge Analytica had obtained consumers' Facebook data by false and deceptive means, in violation of the FTC Act. *Id.* at *10-*11. Specifically, the Commission found that Cambridge Analytica falsely represented that the GSRApp— which asked Facebook users to take a personality test as well as to answer questions related to their political enthusiasm, political orientation, frequency in voting, consistency in voting for the same political party, and views on particular controversial issues—did not collect any personally identifiable information. *Id.* at *3-*5, *10-*11. At the point in the survey where participants were asked to consent to having their Facebook profile data collected, participants were told:

> In this part, we would like to download some of your Facebook data using our Facebook app. We want you to know that we will NOT download your name or any other identifiable information—we are interested in your demographics and likes.

*Id.* at *6. In truth, the GSRApp collected personally identifiable information from the survey participants and their Facebook "Friends," including their Facebook ID (a persistent, unique identifier that connects the user to their Facebook profile), gender, birthdate, and location. *Id.* This data was then used to match the individual participants—and tens of millions of their Facebook

"Friends"—with their voter records and other data provided by Cambridge Analytica. *Id.* at *5-*6. In total, through its use of the GSRApp, Cambridge Analytica harvested Facebook data from approximately 50 to 65 million of the participants' Facebook "Friends," including at least 30 million United States consumers. *Id.* at *6.

In addition to proceeding against Cambridge Analytica, the Commission also brought, and settled, administrative charges against two individuals for their roles in Cambridge Analytica's deceptive scheme: Aleksandr Kogan, the developer of GSRApp, and Alexander Nix, the former Chief Executive Officer of Cambridge Analytica. *See Aleksandr Kogan and Alexander Nix*, Docket No. C-4693, 2019 WL 7168922 (FTC Dec. 18, 2019) (Commission's final order against Kogan); *Aleksandr Kogan and Alexander Nix*, Docket No. C-4694, 2019 WL 7168925 (FTC Dec. 18, 2019) (Commission's final order against Nix).

### B.    The Commission's Investigation Of Bannon's Role In Cambridge Analytica

Because Bannon served as Vice President and board member of Cambridge Analytica during the time that it carried out this deceptive scheme, the Commission opened an investigation into whether Bannon also bore responsibility for Cambridge Analytica's deceptive harvesting of consumers' Facebook data.  Public reports suggested that he did.  *See, e.g.*, Carole Cadwalladr, *'I made Steve Bannon's Psychological Warfare Tool': Meet the Data War Whistleblower*, THE GUARDIAN  (Mar. 18, 2018),  https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.  Accordingly, on September 24, 2019, the Commission issued a CID to Bannon.  Notwithstanding Bannon's repeated efforts to evade service—including one attempt that made the local political press[2]—the Commission succeeded in

---

[2] Nancy Scola, *Federal agency tries to serve Steve Bannon a subpoena*, POLITICO (Sept. 25, 2019), https://www.politico.com/news/2019/09/25/steve-bannon-ftc-subpoena-cambridge-analytica-001022.

personally serving the CID on Bannon on November 14, 2019.  Pet. Ex. 1 (Kopp Decl.), ¶ 12; Pet.

Ex. 3 (Process Server Affs.) at 1-2.

Bannon did not file an administrative petition to limit or quash the CID, including the

demand for an investigational hearing.  Pet. Ex. 1 (Kopp Decl.), ¶ 14.  Between January and

August 2020, Commission staff and Bannon's counsel met and conferred to find a mutually

convenient date for Bannon's investigational hearing so that the Commission could probe, among

other things, Bannon's individual responsibility for Cambridge Analytica's deceptive conduct as well

as his knowledge about any possible continued use of the GSRApp data.  *Id.*, ¶¶ 9, 17.  Due to both

scheduling issues and concerns related to the ongoing COVID-19 pandemic, the Associate Director

for the Commission's Division of Privacy and Identity Protection ("DPIP Associate Director")

formally extended the appearance date for Bannon's investigational hearing on several occasions.  *Id.*

at ¶ 17.

On August 27, 2020, following a meet and confer between Commission staff and Bannon's

counsel, the DPIP Associate Director issued a letter setting a September 29, 2020 appearance date for

Bannon's investigational hearing.  Pet. Ex. 5 (8/27/20 Mithal Letter).  Although Commission staff

offered to conduct Bannon's investigational hearing remotely due to the ongoing COVID-19

pandemic, Bannon's counsel rejected that offer, preferring instead to have the investigational hearing

conducted in-person.  *Id.*; Pet. Ex. 1 (Kopp Decl.), ¶ 18.

### C.    Bannon's Refusal To Appear For An Investigational Hearing Due To An Unrelated Criminal Indictment

On August 20, 2020, an indictment charging Bannon for his role in defrauding donors in

connection with an online crowdfunding campaign, known as "We Build the Wall," was unsealed by

a federal court in the Southern District of New York.  *See* Press Release, *Leaders Of 'We Build The*

*Wall' Online Fundraising Campaign Charged With Defrauding Hundreds Of Thousands Of Donors*,
U.S. DEP'T OF JUSTICE, U.S. ATT'Y'S OFFICE, S. DIST. OF N.Y. (Aug. 20, 2020),
https://www.justice.gov/usao-sdny/pr/leaders-we-build-wall-online-fundraising-campaign-charged-
defrauding-hundreds-thousands (last visited Oct. 21, 2020).  On its face, however, the criminal
indictment has no overlap with the Commission's investigation.  The criminal indictment involves a
different entity (i.e., an online crowdfunding campaign, not Cambridge Analytica); different conduct
at a much later date (i.e., alleged wire fraud and money laundering of crowdfunding contributions in
2018 through 2020, not misleading consumers to obtain personally identifiable Facebook profile
information in 2014); and different alleged victims (i.e., donors to the crowdfunding campaign, not
Facebook users).  *Compare* Pet. Ex. 6 (Bannon Indictment) *with* Pet Ex. 2 (CID) at 4-5.  Indeed, the
only "overlap" between the indictment and the Commission's investigation appears to be Bannon
himself.

Notwithstanding the lack of overlap between the Commission's investigation and the
criminal indictment, Bannon's counsel informed Commission staff on September 3, 2020, that

███████████████████████████████████████████████████

██████████████████████████████████████.  Pet. Ex. 7

(9/3/20 Burck Letter).  Subsequently, █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████.  Pet. Ex. 9 (9/15/20 Burck Letter) at 2; Pet. Ex. 1 (Kopp Decl.),

¶ 23.  On September 28, 2020—the day before the scheduled investigational hearing—Bannon's

counsel informed Commission staff in writing that Bannon "████████████████████████

████████████████████████████████████████" Pet. Ex. 11 (9/28/20 Burck Letter).

## ARGUMENT

I. **The CID For An Investigational Hearing Is Lawful, Seeks Relevant Testimony, And Is Not Unduly Burdensome**

A. **Standards For Enforcement Of Agency Process**

The standards for the judicial enforcement of administrative compulsory process have long been settled in this Circuit: "[T]he court's role in a proceeding to enforce an administrative subpoena is a strictly limited one." *FTC v. Texaco, Inc.*, 555 F.2d 862, 871-72 (D.C. Cir. 1977) (*en banc*) (citing *Endicott Johnson v. Perkins*, 317 U.S. 501, 509 (1943)); *see also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). And "while the court's function is 'neither minor nor ministerial,' the scope of issues which may be litigated in an enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity." *Texaco*, 555 F.2d at 872 (quoting *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 217 n.57 (1946)); *accord FTC v. Anderson*, 631 F.2d 741, 744-45 (D.C. Cir. 1979).

Like any administrative agency, the Commission has broad authority to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt Co.*, 338 U.S at 642-43. A district court must enforce agency investigative process so long as "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *See Texaco*, 555 F.2d at 872 (quoting *Morton Salt*, 338 U.S. at 652). In making this determination, the agency's own appraisal of relevancy must be accepted so long as it is not "obviously wrong." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992) (citing *FTC v. Carter*, 636 F.2d 781, 787-88 (D.C. Cir. 1980)).

Proceedings to enforce administrative investigative subpoenas and civil investigative demands are entitled to summary disposition.  They are special statutory matters cognizable under Fed. R. Civ. P. 81(a)(5), and are properly instituted by a petition and order to show cause (rather than by a complaint and summons).  *See*, *e.g*., *FTC v. MacArthur*, 532 F.2d 1135, 1141-42 (D.C. Cir. 1976).   And they are summary in nature—"discovery is improper in a summary subpoena enforcement proceeding."  *Carter*, 636 F.2d at 789 (quoting *United States v. Exxon Corp.*, 628 F.2d 70, 77 n.7 (D.C. Cir. 1980)); *accord Invention Submission*, 965 F.2d at 1091.

As described in more detail below, all the standards governing enforcement of the Commission's compulsory process have been satisfied.  The Commission had the authority to issue the CID to Bannon, the testimony sought from Bannon is plainly relevant to the Commission's investigation, and compliance with the investigational hearing demand does not impose an undue burden.  Because Bannon cannot provide any valid justifications for his refusal to comply with the CID, it must be enforced.

**B.      The CID Is Within The Commission's Authority And Was Properly Issued According To All Administrative Prerequisites**

Bannon has not disputed that the CID is within the Commission's authority.   The Commission lawfully issued the CID as part of an investigation into whether Bannon, through his role at and involvement with Cambridge Analytica, has committed violations of Section 5 of the FTC Act, 15 U.S.C. § 45.  Pet. Ex. 1 (Kopp Decl.), ¶¶ 3, 9-10; Pet. Ex. 2 (CID) at 4.  In so doing, the Commission acted under a valid agency resolution authorizing the issuance of compulsory process to investigate unfair or deceptive acts or practices relating to consumer privacy and/or data security. Pet. Ex. 1 (Kopp Decl.), ¶ 11; Pet. Ex. 2 (CID) at 14 (attaching a "Resolution Directing Use Of

Compulsory Process in Nonpublic Investigation Of Acts And Practices Related To Consumer Privacy And/Or Data Security").[3]

The Commission properly issued the CID pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1, which authorizes the Commission to issue civil investigative demands "[w]henever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices . . . ." 15 U.S.C. § 57b-1(c)(1); *see also* Pet. Ex. 2 (CID) at 1, 14. The CID was issued consistent with all governing administrative prerequisites. *See* Pet. Ex. 1 (Kopp Decl.), ¶¶ 10-12; 15 U.S.C. §§ 57b-1(c)(2), (c)(3), (c)(7), (i) (requirements for form, content, and service of civil investigative demands); *accord* 16 C.F.R. § 2.7(a), (b). The Commission also personally served Bannon with the CID on November 14, 2019. *Id.*, ¶ 12; Pet. Ex. 3 (Process Server Affs.) at 1-2.

### C. The CID Seeks Testimony From Bannon That Is Reasonably Relevant To The Commission's Investigation

The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudication. In an investigation, the Commission is not limited to seeking information that is necessary to prove a specific charge. The Commission may seek to learn whether there is reason to believe that the law is being violated and, if so, whether issuance of a complaint would be in the public interest. *See Texaco*, 555 F.2d at 72; *Invention Submission Corp.*, 965 F.2d at 1090. The requested testimony "need only be relevant to the *investigation*—the boundary of which may be defined by the agency quite generally . . . ." *Invention Submission Corp.*, 965 F.2d at 1090 (quoting *Carter*, 636 F.2d at 787-88; *Texaco*, 555 F.2d at 874 & n.26) (emphasis in original).

---

[3] Courts have recognized that unfair or deceptive acts or practices involving data security issues fall squarely within the Commission's authority. *See, e.g.*, *FTC v. D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *4 (N.D. Cal. Sept. 19, 2017); *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 615 (D.N.J. 2014), *aff'd*, 799 F.3d 236 (3d Cir. 2015).

Furthermore, in evaluating relevance objections to agency investigations, "a court must respect the agency's 'power of inquisition' and interpret relevance broadly."  *FTC v. Invention Submission Corp.*, No. 89-272(RCL), 1991 WL 47104, at *2 (D.D.C. Feb. 14, 1991) (quoting *Morton Salt*, 338 U.S. at 642), *aff'd*, 965 F.2d 1086.  As the D.C. Circuit has explained, "in the pre-complaint stage, an investigating agency is under no obligation to propound a narrowly focused theory of a possible future case."  *Texaco*, 555 F.2d at 874; *see also Invention Submission Corp.*, 1991 WL 47104, at *2 (agency can inquire "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not") (citation omitted).  Consequently, "[b]ecause the need for investigating allegations of unlawful activity is a substantial one, the law requires that courts give agencies leeway when considering relevance objections."  *Invention Submission Corp.*, 1991 WL 47104, at *2.

Bannon has not contested—nor could he—that his testimony is relevant to the Commission's investigation.[4]  As just one example, the Commission is seeking to determine whether Bannon may be held individually liable for Cambridge Analytica's deceptive collection of consumer information from Facebook users.  Pet. Ex. 1 (Kopp Decl.), ¶¶ 3, 9.  Testimony from Bannon about his role and involvement with Cambridge Analytica bears directly on that question.  *See, e.g.*, *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015) (individuals may be liable for FTC Act violations committed by a corporate entity if they "participated directly in the deceptive practices or acts or had authority to control them") (citations omitted).

---

[4] Indeed, Bannon cannot second-guess the Commission's determination of relevance here.  The Commission's "judgment" that testimony from Bannon would "aid its investigation" is entitled to deference by this Court.  *See FTC v. Bisaro*, 757 F. Supp. 2d 1, 8-9 (D.D.C. 2010) (recognizing that district courts "must defer to the FTC's judgment as to whether further testimony from Respondent will aid its investigation," and ordering respondent to sit for a deposition).

Relatedly, the investigation seeks to probe Bannon's knowledge of questions unresolved by the Commission's proceeding against Cambridge Analytica: What happened to consumers' improperly harvested Facebook data?  And with whom has it been shared?  Pet. Ex. 1 (Kopp Decl.), ¶ 9.  Any continued use of the Facebook data would represent a significant continuing harm for consumers.  *Id.*, ¶ 28.  Even if Bannon disavows having such knowledge, this response needs to be probed through testimony.  This information bears on possible continuing harm to consumers from use of their personal information, which is plainly relevant to the Commission's investigation.  *Id.*

### D.      Compliance With The CID Is Not Unduly Burdensome

This Circuit has recognized that district courts may "impose reasonable conditions and restrictions" on administrative compulsory process when "the demand is unduly burdensome."  *Texaco*, 555 F.2d at 881.  However, at the same time, "[s]ome burden on the subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public inquiry."  *Id.* at 882.  It is respondent's burden to demonstrate that compliance with investigatory process is unduly burdensome, and that burden is not easily met where, as here, "the agency's inquiry is pursuant to a lawful purpose and the requested [testimony] [is] relevant to that purpose."  *Id.* at 882; *see also Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1517 (D.C. Cir. 1993) (same).

For over nine months, Commission staff negotiated with Bannon's counsel to find a mutually convenient date for an investigational hearing and extended the appearance date to accommodate concerns about the ongoing global pandemic.  Pet. Ex. 1 (Kopp Decl.), ¶ 17.  During that time, Bannon's counsel never argued that it was unduly burdensome for Bannon to appear and testify at an investigational hearing before the Commission.  *Id.*, ¶¶ 14-18.  Nor could he, as courts in this District have routinely held that administrative subpoenas requiring a witness to attend a deposition are not

unduly burdensome. *See, e.g.*, *Bisaro*, 757 F. Supp. 2d at 9 (respondent failed to show that "compliance with the subpoena—which merely requires him to testify at a hearing or deposition before the FTC in Washington, D.C.—would be burdensome at all, let alone unduly so").

Bannon's brazen and unilateral refusal to comply with the Commission's investigational hearing demand in the CID is premised solely on his indictment in an unrelated criminal action in the Southern District of New York and his counsel's decision—before the investigational hearing has even occurred—that Bannon will invoke his Fifth Amendment rights to *every* question posed by Commission staff. Pet. Ex. 1 (Kopp Decl.), ¶¶ 20-25. From that preemptive assertion of Bannon's Fifth Amendments rights, and blanket refusal to testify about anything substantive at the investigational hearing, Bannon's counsel argues that requiring Bannon to appear at an investigational hearing to assert his rights is "███████████." Pet. Ex. 9 (9/15/20 Burck Letter). Not so.

As a threshold matter, Bannon cannot refuse to appear for an investigational hearing simply because he intends to invoke his Fifth Amendment rights. Courts have long recognized that an individual's constitutional right against self-incrimination must be invoked in response to specific questions; an individual cannot simply assert the privilege on a blanket basis to avoid sitting for a deposition. *See, e.g.*, *Dist. Title v. Warren*, 265 F. Supp. 3d 17, 21-22 (D.D.C. 2017) (overruling objections to magistrate judge's order requiring individual to appear for a deposition and assert his Fifth Amendment privileges, as appropriate, on a question-by-question basis); *Office of Thrift Supervision, Dep't of Treasury v. Zannis*, No. 90-0136, 1990 WL 421186, at *3 (D.D.C. Aug. 14, 1990) (enforcing administrative subpoena for oral testimony and requiring respondent to make a "particularized claim of privilege in response to specific questions" despite "blanket" assertion of his

Fifth Amendment privilege).[5]   Rather, "the proper procedure is for the [witness] to attend the [proceeding], be sworn under oath, and respond to those questions he can answer without running a risk of self-incrimination."  *See Hansen*, 233 F.R.D. at 668 (noting that witness may assert the privilege to questions, as warranted, provided "he has 'reasonable cause' to believe a direct answer would result in self-incrimination"); *see also* 8 FED. PRAC. & PROC. CIV. § 2018 (3d ed.).

Requiring Bannon to invoke his Fifth Amendment rights at the investigational hearing on a question-by-question basis imposes no undue burden on him.  It is well established a witness can only invoke the privilege where he or she has a reasonable belief that "testimony could 'furnish a link in the chain of evidence needed to prosecute' him [or her] for a crime."  *Warren*, 265 F. Supp. 3d at 21 (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)).   "The witness is not exonerated from answering merely because he declares that in doing so he would incriminate himself—his say-so does not of itself establish the hazard of incrimination."  *Hoffman*, 341 U.S. at 486; *see also Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 478 (1972) (the danger of self-incrimination must be real, not remote or speculative).  Such a rule makes practical sense— without knowing the specific questions to be put to the witness, a district court cannot determine whether the privilege is being properly asserted to each question.  *See United States v. Thornton*, 733 F.2d 121, 125-26 (D.C. Cir. 1984); *Warren*, 265 F. Supp. 3d at 21-22 ("[T]here is a presumption

---

[5] Courts outside this Circuit have recognized witnesses cannot avoid sitting for a deposition simply because they intend to invoke the Fifth Amendment.  *See, e.g.*, *Rutherford v. PaloVerde Health Care Dist.*, 2014 WL 12633525, at *2 (C.D. Cal. Oct. 23, 2014) ("Regardless of the extent to which defendant Hudson may be asked at her deposition for information that may be used in a criminal case against her, she may not assert a blanket Fifth Amendment objection as a basis not to appear for a deposition in this case."); *Vazquez-Rijos v. Anhang*, 654 F.3d 122, 129 (1st Cir. 2011) (noting that "while [the witness] certainly had a right to refuse to answer questions on the basis of her privilege against self-incrimination, it was improper to refuse to appear for any deposition whatsoever on that basis, rather than refuse to answer specific questions" because "[t]he Fifth Amendment privilege cannot be invoked on a blanket basis") (internal citations and quotations omitted); *United States v. Hansen*, 233 F.R.D. 665, 668 (S.D. Cal. 2005) (holding that an individual "cannot refuse to attend a deposition under a blanket claim of Fifth Amendment privilege").

against blanket assertions of Fifth Amendment privilege, and the law is clear that the privilege against self-incrimination must be asserted on a question-by-question basis." (citation and quotation omitted)).

To the extent that Bannon suggests ███████████████████████████████ ██████████████████████████ Pet. Ex. 11 (9/28/20 Burck Letter), that contention is likewise meritless.  The Commission offered to conduct the investigational hearing remotely.  Pet. Ex. 1 (Kopp Decl.), ¶ 18.  It was Bannon's counsel who insisted that the investigational hearing be conducted in-person. *Id.*

The law is clear—if Bannon intends to invoke his Fifth Amendment rights in response to the Commission's lawful demand for testimony, he must appear at the investigational hearing and invoke the privilege on a question-by-question basis.  Bannon cannot use the preemptive assertion of his Fifth Amendment rights to manufacture an undue burden here.  Nor can he use it to relieve himself of his obligation to appear for an investigational hearing pursuant to the CID.

## II.     Bannon's Refusal To Appear For An Investigational Hearing Prejudices The Commission's Efforts To Enforce The FTC Act And Protect The Public

In written correspondence to Commission staff, Bannon's counsel has asserted ██████████ ███████████████████████████████████████████████████████████ ███████████  Pet. Ex. 9 (9/15/20 Burck Letter) at 2.  That is not Bannon's judgment to make, and it is wrong, in any event.

Bannon's unilateral refusal to appear for an investigational hearing until the completion of his criminal trial impedes the Commission's ability to enforce its laws and to protect the public.  Courts have long recognized that the Commission and the public have a strong interest in seeing the prompt enforcement of the laws that Congress has tasked the Commission with enforcing.  *See, e.g.*, *FTC v.*

*Parade of Toys Inc.*, No. CIV.A. 97-2367-GTV, 1997 WL 688752, at *2 (D. Kan. Oct. 15, 1997) (holding that Commission's interest in prosecuting the civil action outweighed the witness's "interest in avoiding the dilemma of invoking his Fifth Amendment privilege," and recognizing that the "enforcement of consumer protection laws . . . substantially invoke[s] the public interest."); *FTC v. Am. Tax Relief, LLC*, No. CV 11-6397-DSF (PJWx), 2011 WL 13129965, at *1 (C.D. Cal. Oct. 19, 2011) (noting "the FTC and the public have a strong interest in the timely resolution of violations of the FTC Act" in denying request for a stay pending resolution of a criminal investigation).[6]

Here, testimony from Bannon is critical to determine whether he has violated the FTC Act through his role at Cambridge Analytica or his participation in Cambridge Analytica's deceptive conduct.  Pet. Ex. 1 (Kopp Decl.), ¶¶ 3, 9.  Although Bannon claims that there is no testimony he can provide without infringing his Fifth Amendment privilege against self-incrimination, the Commission is entitled to put that claim to the test by asking its questions.  Bannon's refusal to appear at the investigational hearing prevents the Commission from doing so.  Moreover, allowing Bannon to stall the Commission's investigation and any potential enforcement action arising therefrom will have the effect of delaying the important consumer protections that the Commission may seek following the completion of its investigation.  *Id.*, ¶¶ 26-28.[7]

---

[6] Congress has empowered the Commission—through the FTC Act—to prevent persons and entities from engaging in "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(2), including by seeking permanent injunctive relief, 15 U.S.C. § 53(b)(2).  Where, as here, Congress has deemed conduct (i.e., deceptive and unfair practices) to be "so offensive" that it can be permanently enjoined, such conduct "inherently require[s] prompt civil enforcement which cannot await the outcome of a criminal investigation."  *See United States v. Ogbazion*, No. 3:12-cv-95, 2012 WL 4364306, at *3 (S.D. Ohio Sept. 24, 2012).

[7] For example, the Commission's orders against Messrs. Kogan and Nix prohibited them from making false or deceptive statements regarding the extent to which they collect, use, share, or sell personal information and the purposes for which they collect, use, share, or sell such information. *See Aleksandr Kogan and Alexander Nix*, Docket No. C-4693, 2019 WL 7168922, at *2 (FTC Dec. 18, 2019) (Section I in the final order against Kogan); *Aleksandr Kogan and Alexander Nix*, Docket No. C-4694, 2019 WL 7168925, at *2 (FTC Dec. 18, 2019) (Section I in the final order against Nix).  In addition, Messrs. Kogan and Nix are required to delete or destroy any personal information

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Commission respectfully requests that this Court issue an

order directing Bannon to comply in full with the CID by appearing—either in-person or remotely

via videoconference—for an investigational hearing within ten days from the date of issuance of this

Court's order, or at such other date as may be established by the Commission.


Dated: November 9, 2020                        Respectfully submitted,

                                               ALDEN F. ABBOTT
                                               General Counsel

                                               JAMES REILLY DOLAN
                                               Principal Deputy General Counsel

                                               MICHELE ARINGTON
                                               Assistant General Counsel for Trial Court
                                               Litigation

                                                 *s/ Linda Holleran Kopp*
                                               LINDA HOLLERAN KOPP (472355)
                                               BRIAN BERGGREN *(Appearing pursuant to
                                               LCvR 83.2(e))*

                                               FEDERAL TRADE COMMISSION
                                               600 Pennsylvania Ave., N.W.,
                                               Mail Stop CC-8232
                                               Washington, D.C. 20580
                                               Tel:  202-326-2267 (Kopp);
                                               202-326-3232 (Berggren)

                                               *Attorneys for Petitioner*

---

collected from consumers via the GSRApp and any related work product that originated from the data. *See Aleksandr Kogan and Alexander Nix*, Docket No. C-4693, 2019 WL 7168922, at *2 (FTC Dec. 18, 2019) (Section II in the final order against Kogan); *Aleksandr Kogan and Alexander Nix*, Docket No. C-4694, 2019 WL 7168925, at *2 (FTC Dec. 18, 2019) (Section II in the final order against Nix).