# Petition Exhibit 1

Declaration of Linda Holleran Kopp

(November 6, 2020)

**Redacted Version of Document Sought to Be Filed
Temporarily Under Seal**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION**
  600 Pennsylvania Avenue, N.W.
  Washington, D.C. 20580,

                              Petitioner,

*v.*

**STEPHEN K. BANNON**
  210 A Street, N.E.
  Washington, D.C. 20002,

                          Respondent.

Misc. Case No.

**DECLARATION OF LINDA HOLLERAN KOPP**

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED TEMPORARILY UNDER SEAL***

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1.       I am an attorney employed by the U.S. Federal Trade Commission ("Commission"), in Washington, D.C.  I am an attorney in the Division of Privacy and Identity Protection and I lead the Commission's investigation of Stephen K. Bannon, File No. 192 3240.

2.       I am authorized to execute a declaration verifying the facts that are set forth in the Petition of the Federal Trade Commission to Enforce Civil Investigative Demand.  I have read the petition and exhibits thereto (hereinafter referred to as Pet. Ex.), and verify that Pet. Ex. 2 through Pet. Ex. 11 are true and correct copies of the original documents.  The facts set forth herein are based on my personal knowledge or information made known to me in the course of my official duties.

3.       The purpose of this investigation is to determine, *inter alia*, whether Mr. Bannon, formerly an officer of Cambridge Analytica, LLC, violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, in connection with Cambridge Analytica's operation of a deceptive scheme that improperly harvested Facebook user profile information for tens of millions of American consumers.

4.      The Commission is commencing this proceeding to enforce a civil investigative demand ("CID") the Commission issued to Mr. Bannon.   The CID requires, *inter alia*, that Mr. Bannon appear for an investigational hearing before Commission staff.   Commission staff and Mr. Bannon's counsel met and conferred on numerous occasions between January and August 2020 to find a mutually convenient date for Mr. Bannon's investigational hearing.   Due to concerns related to the ongoing COVID-19 pandemic, the appearance date for the investigational hearing was postponed several times before ultimately being set for September 29, 2020. Mr. Bannon, however, now refuses to appear for an investigational hearing before Commission staff due to an unrelated criminal action in the United States District Court for the Southern District of New York.

5.      On September 28, 2020, the day before the investigational hearing was scheduled to take place, Mr. Bannon's counsel informed ███████████████████████████████ ████████████████████████████████████████████████.

### Background

6.      Mr. Bannon is the former Vice President and board member of Cambridge Analytica.  Mr. Bannon resides and/or transacts business in the District of Columbia.

7.      On July 22, 2019, the Commission filed an administrative complaint against Cambridge Analytica, a now-defunct data analytics and consulting company that provided voter profiling and marketing services, alleging deceptive conduct in violation of the FTC Act, 15 U.S.C. § 45(a).  *See Cambridge Analytica, LLC*, Docket No. 9389, 2019 WL 6724446, at *1-*2 (FTC Nov. 25, 2019).  In 2014, Cambridge Analytica launched a software application on the Facebook platform called the "GSRApp" to collect Facebook data and survey responses that would be used to predict the users' personality traits as well as their political enthusiasm, political orientation, frequency in voting, consistency in voting for the same political party, and

views on particular controversial issues. *Id.* at *3-*5.  Cambridge Analytica used the data for voter-profiling and targeted advertising purposes.  *Id.* at *5-*6. The Commission's complaint alleged that Cambridge Analytica employed false and deceptive tactics to harvest personal information from tens of millions of Facebook users through the GSRApp.  *Id.*; *see also id.* at *3 (discussing complaint allegations).  After further proceedings, the Commission determined that Cambridge Analytica violated the FTC Act by, among other things, falsely representing that the GSRApp did not collect any personally identifiable information from Facebook users who interacted with the GSRApp.  *Id.* at *10-*11.

8.      The Commission also sought to bring culpable individuals to account for their involvement in Cambridge Analytica's deceptive scheme.  Aleksandr Kogan, the developer of GSRApp, and Alexander Nix, the former Chief Executive Officer of Cambridge Analytica, settled allegations that they violated the FTC Act in their individual capacity for their respective roles in the scheme.  *See Aleksandr Kogan and Alexander Nix*, Docket No. C-4693, 2019 WL 7168922 (FTC Dec. 18, 2019) (Commission's final order against Kogan); *Aleksandr Kogan and Alexander Nix*, Docket No. C-4694, 2019 WL 7168925 (FTC Dec. 18, 2019) (Commission's final order against Nix).

9.      Because Mr. Bannon served as Vice President and a board member of Cambridge Analytica during the relevant time, the Commission opened an additional investigation into whether Mr. Bannon may be held personally liable for his role in Cambridge Analytica's deceptive scheme.  Relatedly, the investigation seeks to probe Mr. Bannon's knowledge of questions unresolved by the Commission's proceeding against Cambridge Analytica investigation:  What happened to consumers' improperly harvested Facebook data?  And with whom has it been shared?

### The Commission's CID to Mr. Bannon

10.     On September 24, 2019, the Commission issued the CID at issue to Mr. Bannon. The CID defines the "subject" of the Commission's investigation as whether Mr. Bannon's "practices regarding the collection and use of consumers' information from Facebook were deceptive or unfair in violation of the [Federal Trade Commission] Act, 15 U.S.C. § 45, and whether a Commission action to obtain monetary relief would be in the public interest."  Pet. Ex. 2 (CID) at 4.

11.     The CID was issued pursuant to Commission Resolution No. 1823036, which authorizes the use of compulsory process under Section 20 of the FTC Act, 15 U.S.C. §57b-1:

> [t]o determine whether unnamed persons, partnerships, corporations, or others are engaged in, or may have engaged in, deceptive or unfair acts or practices related to consumer privacy and/or data security, including but not limited to the collection, acquisition, use, disclosure, security, storage, retention, or disposition of consumer information, in or affecting commerce, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended.

Pet. Ex. 2 (CID) at 14.  The CID was signed by Chairman Joseph J. Simons, acting under authority delegated by the Commission in Section 2.7(a) of its Rules of Practice, 16 C.F.R § 2.7(a), and served by the Commission's Secretary pursuant to the Commission's Rules.  Pet. Ex. 2 (CID) at 1.

12.     The Commission personally served the CID on Mr. Bannon on November 14, 2019.  Pet. Ex. 3 (Process Server Affs.) at 1-2.

13.     After Mr. Bannon was personally served with the CID, Commission staff and Mr. Bannon's counsel met, conferred, and communicated regarding Mr. Bannon's rolling production of information and documents in response to the CID.

14.     Mr. Bannon did not file an administrative petition to limit or quash the CID, including the demand for an investigational hearing.

15.     On November 21, 2019, Maneesha Mithal, Associate Director for the Division of Privacy and Identity Protection at the Commission ("DPIP Associate Director"), issued a letter formally modifying and extending the appearance date in the CID for Mr. Bannon's investigational hearing pursuant to the Commission's Rule of Practice 2.7(l), 16 C.F.R. § 2.7(l). Pet. Ex. 4 (11/21/19 Mithal Letter).

16.     From January through February 2020, Mr. Bannon answered interrogatories and produced documents on a rolling basis pursuant to the specifications contained in the CID.

17.     Between January and August 2020, Commission staff and Mr. Bannon's counsel met and conferred to find a mutually convenient date for Mr. Bannon's investigational hearing. During that time, Mr. Bannon's counsel never argued that it was unduly burdensome for Mr. Bannon to appear and testify at an investigational hearing before the Commission. Due to concerns related to the ongoing COVID-19 pandemic, the DPIP Associate Director extended the appearance date for Mr. Bannon's investigational hearing on several occasions.

18.     On August 27, 2020, following a meet and confer between Commission staff and Mr. Bannon's counsel, the DPIP Associate Director issued a letter setting a September 29, 2020 appearance date for Mr. Bannon's investigational hearing. Pet. Ex. 5 (8/27/20 Mithal Letter). Although Commission staff offered to conduct Mr. Bannon's investigational hearing remotely due to the ongoing COVID-19 pandemic, Mr. Bannon's counsel rejected that offer, preferring instead to have the investigational hearing conducted in-person.

**Mr. Bannon's Refusal to Appear for his Investigational Hearing**

19.     On August 20, 2020, an indictment charging Mr. Bannon for his role in defrauding donors in connection with an online crowdfunding campaign, known as "We Build

the Wall," was unsealed by a federal court in the Southern District of New York.  Pet. Ex. 6
(Bannon Indictment).

20.     On September 3, 2020, Mr. Bannon's counsel sent a letter to Commission staff
claiming that Mr. Bannon ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████.  Pet. Ex. 7 (9/3/20 Burck
Letter).

21.     The following day, Commission staff emailed Mr. Bannon's counsel to request a
meet and confer regarding the September 3 letter.  Pet. Ex. 8 (9/4/20 Kopp Email).

22.     On September 10, 2020, Commission staff and Mr. Bannon's counsel met and
conferred regarding the September 3 letter.   Commission staff inquired about the basis of
Mr. Bannon's objection to sitting for an investigational hearing in light of the lack of overlap
between the Commission's investigation and the criminal indictment.  Mr. Bannon's counsel
asserted that federal prosecutors could seek to admit Mr. Bannon's testimony to the Commission
against him under Federal Rule of Evidence 404(b); therefore, Mr. Bannon would assert his Fifth
Amendment privilege against self-incrimination and not testify about anything substantive at the
investigational hearing.   At no point during the meet and confer did Mr. Bannon's counsel
communicate that Mr. Bannon outright refused to attend the investigational hearing.   To the
contrary, Mr. Bannon's counsel indicated that Mr. Bannon could attend the scheduled
investigational hearing and simply refuse to answer questions.

23.     On September 15, 2020, Mr. Bannon's counsel sent a letter to Commission staff
following-up on the September 10 meet and confer.  Pet. Ex. 9 (9/15/20 Burck Letter).  Like the
September 10 meet and confer, the September 15 letter ██████████████████████████



Pet. Ex. 9 (9/15/20 Burck Letter) at 2 (emphasis added).

24.     On September 22, 2020, Commission staff responded to the September 15 letter, disputing counsel's characterizations of the September 10 meet and confer.  Commission staff reiterated its position that, to the extent Mr. Bannon intends to invoke his Fifth Amendment privilege, he must do so on a question-by-question basis at the investigational hearing. Commission staff also provided Mr. Bannon's counsel with the COVID-19 visitor guide policies for the Commission's building.  Pet. Ex. 10 (9/22/20 Kopp Email).

25.     On September 28, 2020, at 2:55 p.m. eastern daylight time, Mr. Bannon's counsel sent a letter to Commission staff advising that Mr. Bannon "████████████████ ████████████████████████████████"  Pet. Ex. 11 (9/28/20 Burck Letter).

26.     Mr. Bannon's failure to comply with the CID burdens the Commission's investigation, forces the Commission to expend additional public resources, prevents the Commission from completing its investigation in a timely manner, and from determining whether Mr. Bannon should be held personally liable for his role in Cambridge Analytica's deceptive scheme.

27.     Further delays in the Commission's investigation caused by Mr. Bannon's failure to appear for an investigational hearing are contrary to the public interest.  Should the

Commission determine that Mr. Bannon has violated the FTC Act, the Commission is likely to bring an enforcement action and seek an order—likely modeled after the orders against Aleksandr Kogan and Alexander Nix for their respective roles in Cambridge Analytica's deceptive scheme—to protect consumers from harm arising from those violations. For example, the Commission may seek deletion of any data collected from consumers under false pretenses, thereby mitigating harm from such collection. Accordingly, a significant delay in the Commission's investigation and any potential enforcement action arising therefrom will have the effect of delaying the important consumer protections that the Commission may seek following the completion of its investigation.

28.    Additionally, any further delays in discovering additional information about where the deceptively obtained Facebook profile data may be located, or with whom it may have been shared, would further harm consumers. Because the deceptively obtained Facebook profile data pertains to tens of millions of consumers' stable personality traits, and may allow entities to target the consumers or try to influence them in ways that would be difficult for the consumers to recognize, any further delays that would allow the continued use of this data harm consumers.

29.    No previous application for the relief sought herein has been made to this Court or any other.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on November 6, 2020

_____
Linda Holleran Kopp

# Petition Exhibit 2

Civil Investigative Demand to Stephen K. Bannon

(September 24, 2019)

United States of America
Federal Trade Commission

## *CIVIL INVESTIGATIVE DEMAND*

| 1. TO | 1a. MATTER NUMBER |
|---|---|
| Stephen Bannon<br>210 A Street, N.E.<br>Washington, D.C. 20002 | 192 3240 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

### 2. ACTION REQUIRED

[X] You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| Federal Trade Commission<br>400 Seventh Street, Southwest<br>Washington, D.C. 20580 | Linda Holleran Kopp or other duly designated person |
| | DATE AND TIME OF HEARING OR DEPOSITION |
| | NOV 2 3 2019   9 00 am |

[X] You are required to produce all documents described in the attached schedule that are in your possession, custody, or control; and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

[X] You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

[ ] You are required to produce the tangible things described on the attached schedule.  Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

OCT 2 4 2019   by 5 00 pm

### 3. SUBJECT OF INVESTIGATION

See attached Schedule and attached resolution

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Alexander Iglesius / Kevin Havens<br>Federal Trade Commission<br>600 Pennsylvania Ave., NW, Mail Stop CC-8232<br>Washington, DC 20580 | Linda Kopp (202) 326-2267<br>Federal Trade Commission<br>600 Pennsylvania Ave., NW, Mail Stop CC-8232<br>Washington, DC 20580 |

| DATE ISSUED<br>9/24/19 | COMMISSIONER'S SIGNATURE<br>Joseph J. Simons |
|---|---|

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

# Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____    _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

**FEDERAL TRADE COMMISSION ("FTC")**
**CIVIL INVESTIGATIVE DEMAND ("CID") SCHEDULE**
**FTC File No. 192 3240**

**Meet and Confer:** You must contact **FTC counsel Linda Kopp (202-326-2267; lkopp@ftc.gov)** as soon as possible to schedule a meeting (telephonic or in person) to be held within fourteen (14) days after You receive this CID. At the meeting, You must discuss with FTC counsel any questions You have regarding this CID or any possible CID modifications that could reduce Your cost, burden, or response time yet still provide the FTC with the information it needs to pursue its investigation. The meeting also will address how to assert any claims of protected status (*e.g.*, privilege, work-product, etc.) and the production of electronically stored information. You must make available at the meeting personnel knowledgeable about Your information or records management systems, Your systems for electronically stored information, custodians likely to have information responsive to this CID, and any other issues relevant to compliance with this CID.

**Document Retention**: You must retain all documentary materials used in preparing responses to this CID. The FTC may require the submission of additional Documents later during this investigation. **Accordingly, You must suspend any routine procedures for Document destruction and take other measures to prevent the destruction of Documents in Your possession, custody or control** that are in any way relevant to this investigation, even if those Documents are being retained by a third-party or You believe those Documents are protected from discovery. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

**Sharing of Information:** The FTC will use information You provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces. We will not disclose such information under the Freedom of Information Act, 5 U.S.C. § 552. We also will not disclose such information, except as allowed under the FTC Act (15 U.S.C. § 57b-2), the Commission's Rules of Practice (16 C.F.R. §§ 4.10 & 4.11), or if required by a legal obligation. Under the FTC Act, we may provide Your information in response to a request from Congress or a proper request from another law enforcement agency. However, we will not publicly disclose such information without giving You prior notice.

**Manner of Production**: You may produce documentary material or tangible things by making them available for inspection and copying at Your principal place of business. Alternatively, You may send all responsive Documents and tangible things to **Alexander Iglesius, Federal Trade Commission, Division of Privacy and Identity Protection, 600 Pennsylvania Avenue NW, Mail Stop CC-8232, Washington, DC 20580**. If You are sending the materials, use a courier service such as Federal Express or UPS because heightened security measures delay postal delivery to the FTC. You must inform FTC counsel by email or telephone of how You intend to produce materials responsive to this CID at least five days before the return date.

**Certification of Compliance**: You or any person with knowledge of the facts and circumstances relating to the responses to this CID must certify that such responses are complete by completing the "Form of Certificate of Compliance" set forth on the back of the CID form or by signing a declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.

1

**Definitions and Instructions**:  Please review carefully the Definitions and Instructions that appear after the Specifications and provide important information regarding compliance with this CID.

## SUBJECT OF INVESTIGATION

Whether Stephen K. Bannon's practices regarding the collection and use of consumers' information from Facebook were deceptive or unfair in violation of the FTC Act, 15 U.S.C. § 45, and whether a Commission action to obtain monetary relief would be in the public interest. *See also* attached resolution.

## SPECIFICATIONS

**Applicable Time Period:**  Unless otherwise directed, the applicable time period for the requests set forth below is from **January 1, 2013 until the date of full and complete compliance with this CID.**

### Interrogatories

1.  Specify Your complete legal name, all other names by which You have gone by, countr(ies) of citizenship, and place(s) of residence during the relevant time period.

2.  For each year during the relevant time period, state all monies by type (*e.g.*, salary, profit-sharing, other monetary benefits) You received from Cambridge Analytica or in connection with services You provided Cambridge Analytica.

3.  Describe in Detail Your responsibilities at Cambridge Analytica and the date(s) in which You held those responsibilities.

4.  Regarding GSRApp:

     a.  Describe in Detail Your involvement in the development or operation of GSRApp, the collection or analysis of data collected through GSRApp, and the decisions on how to use the data collected through GSRApp;

     b.  Describe all the ways in which You or Cambridge Analytica used any Facebook User Data, Facebook Friend Data, or Derivative Facebook Data (*e.g.*, creation of profiles for targeted advertising, models, or predictive algorithms);

     c.  Identify each third party with whom You or Cambridge Analytica shared, sold, or otherwise provided access to any Facebook User Data, Facebook Friend Data, or Derivative Facebook Data, and describe the specific types of such data that were shared, sold, or to which access was granted; the purpose for the sharing, sale, or grant of access; and the manner in which access was granted (*e.g.*, had their own copy of the data, had login credentials to access the data on X company's servers);

2

    d. State whether You or Cambridge Analytica destroyed all or part of the Facebook User Data, Facebook Friend Data and Derivative Facebook Data, and

        i. If yes, Describe in Detail what specific types of data were destroyed, when such data were destroyed, how such data were destroyed, and describe any certifications You or Cambridge Analytica offered to Dr. Kogan, Facebook, or any other entity in connection with such destruction;

        ii. If no, Describe in Detail each specific type of Facebook User Data, Facebook Friend Data, and Derivative Facebook Data that still exists, even if it is no longer being used today; each product or service that continues to utilize the Facebook User Data, Facebook Friend Data, or Derivative Facebook Data; the location of where such Facebook User Data, Facebook Friend Data or Derivative Facebook Data is stored; and, by year, the annual revenues You or Cambridge Analytica have received from the sale or provision of each such product or service.

5.    Identify each entity in which You have had any role (*e.g.*, employee, officer, board member, financier) that has collected, analyzed, or used Facebook User Data, Facebook Friend Data or Derivative Facebook Data; and Describe in Detail Your role(s) and responsibilities at each entity, the dates You held those responsibilities, an overview of the entity's purpose, the entity's products and services that have used Facebook User Data, Facebook Friend Data or Derivative Facebook Data, and the type(s) and source(s) of Facebook User Data, Facebook Friend Data, or Derivative Facebook Data that have been used by the entity.

6.    State whether You have destroyed any Documents related to Cambridge Analytica, Your activities in relation to Cambridge Analytica, Facebook User Data, Facebook Friend Data or Derivative Facebook User Data. If yes, Describe in Detail the Documents that were destroyed, the date each Document was destroyed; the circumstances and reason(s) for why each Document was destroyed; and the manner of destruction.

## **Document Requests**

1.    Submit all Agreements between You and Cambridge Analytica, and all other Documents Sufficient to Show Your role or responsibilities at Cambridge Analytica.

2.    Submit all Communications relating to Dr. Kogan, GSR, GSRApp, Facebook User Data, Facebook Friend Data, Derivative Facebook Data, or products or services related to or otherwise including, in whole or in part, Facebook User Data, Facebook Friend Data or Derivative Facebook Data.

3.    Submit all Agreements between You or Cambridge Analytica and any third party identified in response to Interrogatory 4(c).

4.    Submit all Documents relating to any request by Facebook for You or Cambridge Analytica to destroy data received from or about any Facebook user by or through GSRApp.

3

## DEFINITIONS

The following definitions apply to this CID:

D-1.   "**You**" or "**Your**" means Stephen K. Bannon.

D-2.   "**Agreement**" shall mean any oral, written or implied contract, arrangement, understanding or plan, whether formal or informal, between two or more Persons, together with all modifications or amendments thereto.

D-3.   "**Cambridge Analytica**" means Cambridge Analytica, LLC, its parent, wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, including SCL Group, SCL Elections Ltd ("SCL Elections") and SCL USA, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing.

D-4.   "**Communication**" shall mean any transmittal, exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished, and includes all communications, whether written or oral, and all discussions, meetings, board presentations, telephone communications, or email contacts.

D-5.   "**Derivative Facebook Data**" shall mean any information that includes, in whole or in part, Facebook User Data or Facebook Friend Data.

D-6.   "**Describe in Detail**" shall mean providing the information requested in narrative form, and shall include an explanation of each material change, if any, made over the applicable time period relating to the practices described, as well as the effective date of the change(s), and the reason(s) for such change(s).

D-7.   "**Document**" means the complete original, all drafts, and any non-identical copy, whether different from the original because of notations on the copy, different metadata, or otherwise, of any item covered by 15 U.S.C. § 57b-1(a)(5), 16 C.F.R. § 2.7(a)(2), or Federal Rule of Civil Procedure 34(a)(1)(A).

D-8.   "**Facebook**" means Facebook Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing.

D-9.   "**Facebook Friend Data**" means any Personal Information or other data (*e.g.*, birthdate, hometown, 'likes') that was originally collected or harvested through the Facebook Graph API from a Facebook user who did not download, install, or directly interact with GSRApp, but who was a Friend of such a user.

D-10.  "**Facebook Graph API**" means the application programming interface that is the primary way to get data into and out of the Facebook platform, and can be used to programmatically query data, post new stories, manage ads, upload photos, and perform a wide variety of other tasks.

4

D-11.  **"Facebook User Data"** means any Personal Information or other data (*e.g.*, birthdate, hometown, 'likes') that was originally collected or harvested through the Facebook Graph API about a Facebook user through his or her direct interaction with GSRApp (such as downloading or installing the app).

D-12.  **"Friend"** means any Person who is in the social network of a Facebook user.

D-13.  **"GSR"** means Global Science Research Ltd, its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, members, agents, consultants, and other persons working for on behalf of the foregoing.

D-14.  **"GSRApp"** means all versions and iterations of the GSRApp Facebook application, including "thisisyourdigitallife" and "CPWLab," that was first placed on the Facebook platform on or about November 2013.

D-15.  **"Identify"** or **"the Identity of"** requires identification of (a) natural persons by name, title, present business affiliation, present business address, telephone number, and email address or, if a present business affiliation or present business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, and the identities of Your contact persons at the business or organization.

D-16.  **"Person"** or **"Persons"** includes You, and means any natural person, corporate entity, partnership, association, joint venture, governmental entity, trust, or any other organization or entity engaged in commerce.

D-17.  **"Personal Information"** shall mean all information regarding or capable of being associated with an individual consumer or mobile device including, but not limited to, a consumer's: name, email address, physical address, telephone number, gender, date of birth, health and fitness information, educational information, religious or political views or affiliations, data fields that can be accessed or collected through the Facebook Graph API from or about Facebook Users or their Friends (*e.g.*, "likes," "hometowns," "birthdates," "photos"), marital or other relationship status, precise geolocation information, information that is created, maintained, or accessed by the consumer (*e.g.*, "messages"), any data regarding a consumer's activities online (*e.g.*, searches conducted, web pages visited, or content viewed), any user credentials, such as a username and password, and a persistent unique identifier, such as a mobile device ID.

D-18.  All references to "year" refer to the calendar year.  Where information is requested "for each year," provide it separately for each year; where yearly data is not yet available, provide responsive information for the calendar year to date, unless otherwise instructed.

D-19.  All references to "and" as well as "or" shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any specification all information that otherwise might be construed to be outside the scope of the specification.

## INSTRUCTIONS

I-1.    **Petitions to Limit or Quash**:  You must file any petition to limit or quash this CID with the Secretary of the FTC no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date.  Such petition must set forth all assertions of protected status or other factual and legal objections to the CID and comply with the requirements set forth in 16 C.F.R. § 2.10(a)(1) – (2).  **The FTC will not consider petitions to quash or limit if You have not previously met and conferred with FTC staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.**  16 C.F.R. § 2.7(k); *see also* § 2.11(b).  **If You file a petition to limit or quash, You must still timely respond to all requests that You do not seek to modify or set aside in Your petition.**  15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10(b).

I-2.    **Withholding Requested Material / Privilege Claims**:  For specifications requesting production of Documents or answers to written interrogatories, if You withhold from production any material responsive to this CID based on a claim of privilege, work product protection, statutory exemption, or any similar claim, You must assert the claim no later than the return date of this CID, and You must submit a detailed log, in a searchable electronic format, of the items withheld that identifies the basis for withholding the material and meets all the requirements set forth in 16 C.F.R. § 2.11(a) – (c).  The information in the log must be of sufficient detail to enable FTC staff to assess the validity of the claim for each Document, including attachments, without disclosing the protected information.  If only some portion of any responsive material is privileged, You must submit all non-privileged portions of the material.  Otherwise, produce all responsive information and material without redaction.  16 C.F.R. § 2.11(c).  The failure to provide information sufficient to support a claim of protected status may result in denial of the claim.  16 C.F.R. § 2.11(a)(1).

I-3.    **Modification of Specifications**:  The Bureau Director, a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director must agree in writing to any modifications of this CID.  16 C.F.R. § 2.7(l).

I-4.    **Scope of Search**:  This CID covers Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity.

I-5.    **Identification of Responsive Documents**:  For specifications requesting production of Documents, You must identify in writing the Documents that are responsive to the specification.  Documents that may be responsive to more than one specification of this CID need not be produced more than once.  If any Documents responsive to this CID have been previously supplied to the FTC, You may identify the Documents previously provided and the date of submission.

I-6.    **Maintain Document Order**:  For specifications requesting production of Documents, You must produce Documents in the order in which they appear in Your files or as electronically stored.  If Documents are removed from their original folders, binders, covers, containers, or

6

electronic source, You must specify the folder, binder, cover, container, or electronic media or file paths from which such Documents came.

I-7.    **Numbering of Documents**:  For specifications requesting production of Documents, You must number all Documents in Your submission with a unique identifier such as a Bates number or a Document ID.

I-8.    **Production of Copies**:  For specifications requesting production of Documents, unless otherwise stated, You may submit copies in lieu of original Documents if they are true, correct, and complete copies of the originals and You preserve and retain the originals in their same state as of the time You received this CID.  Submission of copies constitutes a waiver of any claim as to the authenticity of the copies should the FTC introduce such copies as evidence in any legal proceeding.

I-9.    **Production in Color**:  For specifications requesting production of Documents, You must produce copies of advertisements in color, and You must produce copies of other materials in color if necessary to interpret them or render them intelligible.

I-10.   **Electronically Stored Information**:  For specifications requesting production of Documents, see the attached FTC Bureau of Consumer Protection Production Requirements ("Production Requirements"), which detail all requirements for the production of electronically stored information to the FTC.  You must discuss issues relating to the production of electronically stored information with FTC staff **prior to** production.

I-11.   **Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI")**:  For specifications requesting production of Documents or answers to written interrogatories, if any responsive materials contain Sensitive PII or SHI, please contact FTC counsel before producing those materials to discuss whether there are steps You can take to minimize the amount of Sensitive PII or SHI You produce, and how to securely transmit such information to the FTC.

        Sensitive PII includes an individual's Social Security number; an individual's biometric data (such as fingerprints or retina scans, but not photographs); and an individual's name, address, or phone number in combination with one or more of the following:  date of birth, Social Security number, driver's license or state identification number (or foreign country equivalent), passport number, financial account number, credit card number, or debit card number.  SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I-12.   **Interrogatory Responses**:  For specifications requesting answers to written interrogatories:  (a) answer each interrogatory and each interrogatory subpart separately, fully, and in writing; and (b) verify that Your answers are true and correct to Your knowledge by signing the "Certification of Compliance" attached to this CID.

I-13.   **Oral Testimony Procedures**:  The taking of oral testimony pursuant to this CID will be conducted in conformity with Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, and with Part 2A of the FTC's Rules, 16 C.F.R. §§ 2.7(f), 2.7(h), and 2.9.

8

**Federal Trade Commission - Bureau of Consumer Protection**
**Production Requirements**
Revised August 2019

In producing information to the FTC, comply with the following requirements, unless the FTC agrees otherwise.  If you have questions about these requirements, please contact FTC counsel before production.

**Production Format**

1. **General Format**:  Provide load-ready electronic productions with:

   a. A delimited data load file (.DAT) containing a line for every document, unique id number for every document (DocID), metadata fields, and native file links where applicable;

   b. A document level text file, named for the DocID, containing the text of each produced document; and

   c. An Opticon image load file (.OPT) containing a line for every image file, where applicable.

2. **Electronically Stored Information (ESI)**:  Documents stored in electronic format in the ordinary course of business must be produced in the following format:

   a. For ESI other than the categories below, submit in native format.  Include document level extracted text or Optical Character Recognition (OCR), all metadata, and corresponding image renderings converted to Group IV, 300 DPI, single-page TIFF (or color JPEG images when necessary to interpret the contents or render them intelligible).

   b. For Microsoft Excel, Access, or PowerPoint files, submit in native format with extracted text and metadata.  Data compilations in Excel spreadsheets or delimited text formats must contain all underlying data, formulas, and algorithms without redaction.

   c. For other spreadsheet, database, presentation, or multimedia formats; instant messages; or proprietary applications, discuss the production format with FTC counsel.

3. **Hard Copy Documents**:  Documents stored in hard copy in the ordinary course of business must be scanned and submitted as 300 DPI single page TIFFs (or color JPEGs when necessary to interpret the contents or render them intelligible), with corresponding document-level OCR text and logical document determination in an accompanying load file.

4. **Document Identification**:  Provide a unique DocID for each hard copy or electronic document, consisting of a prefix and a consistent number of numerals using leading zeros.  Do not use a space to separate the prefix from numbers.

5. **Attachments**:  Preserve the parent/child relationship by producing attachments as separate documents, numbering them consecutively to the parent email, and including a reference to all attachments.

6. **Metadata Production**: For each document submitted electronically, include the standard metadata fields listed below in a standard delimited data load file. The first line of the data load file shall include the field names. <u>Submit date and time data in separate fields</u>. Use these standard Concordance delimiters in delimited data load files:

| Description | Symbol | ASCII Character |
|---|---|---|
| Field Separator | ¶ | 20 |
| Quote Character | þ | 254 |
| Multi Entry delimiter | ® | 174 |
| <Return> Value in data | ~ | 126 |

7. **De-duplication**: Do not use de-duplication or email threading software without FTC approval.

8. **Password-Protected Files**: Remove passwords prior to production. If password removal is not possible, provide the original and production filenames and the passwords, under separate cover.

<u>Producing Data to the FTC</u>

1. Prior to production, scan all data and media for viruses and confirm they are virus-free.

2. For productions smaller than 50 GB, submit data electronically using the FTC's secure file transfer protocol. Contact FTC counsel for instructions. **The FTC cannot accept files via Dropbox, Google Drive, OneDrive, or other third-party file transfer sites**.

3. If you submit data using physical media:

   a. Use only CDs, DVDs, flash drives, or hard drives. Format the media for use with Windows 7;

   b. Use data encryption to protect any Sensitive Personally Identifiable Information or Sensitive Health Information (as defined in the instructions), and provide passwords in advance of delivery, under separate cover; and

   c. Use a courier service (e.g., Federal Express, UPS) because heightened security measures delay postal delivery.

4. Provide a transmittal letter with each production that includes:

   a. Production volume name (e.g., Volume 1) and date of production;

   b. Numeric DocID range of all documents in the production, and any gaps in the DocID range; and

   c. List of custodians and the DocID range for each custodian.

**Standard Metadata Fields**

| DAT FILE FIELDS | DEFINITIONS | POPULATE FIELD FOR: |
|---|---|---|
| DocID | Unique ID number for each document | All Documents |
| FamilyID | Unique ID for all documents in a family including parent and all child documents | All Documents |
| ParentID | Document ID of the parent document. This field will only be populated on child items | All Documents |
| File Path | Path to produced native file | All Documents |
| TextPath | Path to document level text or OCR file | All Documents |
| Custodian | Name of the record owner/holder | All Documents |
| AllCustodians | Names of all custodians that had copy of this record (populate if data was deduplicated or email threading was used) | All Documents |
| Source | Source of documents: CID, Subpoena, Third Party Data, etc. | All Documents |
| Filename | Original file name | All Documents |
| File Size | Size of documents | All Documents |
| File Extensions | Extension of file type | All Documents |
| MD5 Hash | Unique identifier for electronic data used in de-duplication | All Documents |
| PRODUCTION_VOLUME | Production Volume | All Documents |
| HASREDACTIONS | Redacted document | All Documents |
| Exception Reason | Reason for exception encountered during processing (e.g., empty file, source file, password-protected file, virus) | All Documents |
| PRODBEG | Beginning production bates number | Documents with Produced Images |
| PROEND | Ending production bates number | Documents with Produced Images |
| PRODBEG_ATTACH | Beginning production family bates number | Documents with Produced Images |
| PRODEND_ATTACH | Ending production family bates number | Documents with Produced Images |
| Page Count | The number of pages the document contains | Documents with Produced Images |
| From | Names retrieved from the FROM field in a message | Emails |
| To | Names retrieved from the TO field in a message; the recipient(s) | Emails |
| CC | Names retrieved from the CC field in a message; the copied recipient(s) | Emails |
| BCC | Names retrieved from the BCC field in a message; the blind copied recipient(s) | Emails |
| EmailSubject | Email subject line | Emails |
| Date Sent | The date an email message was sent | Emails |
| Time Sent | The time an email message was sent | Emails |
| Date Received | The date an email message was received | Emails |
| Time Received | The time an email message was received | Emails |
| Author | File Author | Loose Native Files and Email Attachments |
| Title | File Title | Loose Native Files and Email Attachments |
| Subject | File Subject | Loose Native Files and Email Attachments |
| Date Created | Date a document was created by the file system | Loose Native Files and Email Attachments |
| Time Created | Time a document was created by the file system | Loose Native Files and Email Attachments |
| Date Modified | Last date a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Time Modified | Last time a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Date Printed | Last date a document was printed and recorded by the file system | Loose Native Files and Email Attachments |
| Time Printed | Last time a document was printed and recorded by the file system | Loose Native Files and Email Attachments |

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:           Joseph J. Simons, Chairman
                         Noah Joshua Phillips
                         Rohit Chopra
                         Rebecca Kelly Slaughter
                         Christine S. Wilson

## RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN NONPUBLIC INVESTIGATION OF ACTS AND PRACTICES RELATED TO CONSUMER PRIVACY AND/OR DATA SECURITY

File No. 1823036

Nature and Scope of Investigation:

To determine whether unnamed persons, partnerships, corporations, or others are engaged in, or may have engaged in, deceptive or unfair acts or practices related to consumer privacy and/or data security, including but not limited to the collection, acquisition, use, disclosure, security, storage, retention, or disposition of consumer information, in or affecting commerce, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended. Such investigation shall, in addition, determine whether Commission action to obtain monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation not to exceed five (5) years from the date of issuance of this resolution. The expiration of this five-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the five-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the five-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq.* and supplements thereto.

By direction of the Commission.

April J. Tabor

Acting Secretary

Issued: March 14, 2019

## CERTIFICATION OF COMPLIANCE
### Pursuant to 28 U.S.C. § 1746

I, _____, certify the following with respect to the Federal Trade Commission's ("FTC") Civil Investigative Demand directed to me, FTC File No. 192 3240 (the "CID"):

1.    I have identified all documents, information, and/or tangible things ("responsive information") in my possession, custody, or control responsive to the CID and either:

        (a) provided such responsive information to the FTC; or

        (b) for any responsive information not provided, given the FTC written objections setting forth the basis for withholding the responsive information.

2.    I verify that the responses to the CID are complete and true and correct to my knowledge.


I certify under penalty of perjury that the foregoing is true and correct.


Date: _____

_____
Signature

_____
Printed Name

_____
Title



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Office of the Secretary

### *Via Certified Mail, Return Receipt Requested*

Mr. Stephen K. Bannon
210 A Street, N.E.
Washington, D.C. 20002

      Re: *In re Stephen K. Bannon*, FTC Matter No. 192 3240

Dear Mr. Bannon:

      The Federal Trade Commission ("FTC") has issued the attached Civil Investigative Demand ("CID") asking for information as part of the above-referenced non-public investigation. Our purpose is to determine whether Stephen K. Bannon's practices regarding the collection and use of consumers' information from Facebook were deceptive or unfair in violation of the FTC Act, 15 U.S.C. § 45, and whether a Commission action to obtain monetary relief would be in the public interest. Please read the attached documents carefully. Here are a few important points we would like to highlight:

1. **Contact FTC counsel, Linda Holleran Kopp, 202-326-2267, lkopp@ftc.gov, as soon as possible to schedule an initial meeting to be held within 14 days.** You can meet in person or by phone to discuss any questions you have, including whether there are changes to how you comply with the CID that would reduce your cost or burden while still giving the FTC the information it needs. Please read the attached documents for more information about that meeting.

2. **If you have not already done so, you must immediately stop any routine procedures for electronic or paper document destruction, and you must preserve all paper or electronic documents** that are in any way relevant to this investigation, even if you believe the documents are protected from discovery by privilege or some other reason.

3. **The FTC will use information you provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces.** We will not disclose the information under the Freedom of Information Act, 5 U.S.C. § 552. We may disclose the information in response to a valid request from Congress, or other civil or criminal federal, state, local, or foreign law enforcement agencies for their official law enforcement purposes. The FTC or other agencies may use and disclose your response in any federal, state, or foreign civil or criminal proceeding, or if required to do so by law. However, we will not publicly disclose your information without giving you prior notice.

4. **Please read the attached documents closely.** They contain important information about how you should provide your response, and where and when you must appear to give testimony.

Please contact FTC counsel as soon as possible to set up an initial meeting.  We appreciate your cooperation.

Very truly yours,

April Tabor
Acting Secretary of the Commission

# Petition Exhibit 3

Affidavits of Process Servers

(Dated November 15, 2019)

# AFFIDAVIT OF PROCESS SERVER

### United States of America Federal Trade Commission

**In RE: Stephen Bannon**

VS.

Attorney: Linda Kopp

Federal Trade Commission
Division of Privacy & Identity Protection, 600
Pennsylvania Ave., NW
Washington DC 20580



**\*248697\***

**Case Number: FTC Matter No. 192 3240**

Legal documents received by Same Day Process Service, Inc. on **11/13/2019** at **2:58 PM** to be served upon **Stephen Bannon at 210 A St., NE, Washington, DC 20002**

I, **Brandon Snesko**, swear and affirm that on **November 14, 2019** at **10:45 AM**, I did the following:

**Personally** Served **Stephen Bannon** the person listed as the intended recipient of the legal document with this **Letter (undated); Civil Investigative Demand; Federal Trade Commission ("FTC") Civil Investigative Demand ("CID") Schedule; Federal Trade Commission - Bureau of Consumer Protection - Production Requirements** at **210 A St., NE , Washington, DC 20002**.

**Description of Person Accepting Service:**
Sex: Male Age: 65 Height: 5ft9in-6ft0in Weight: Over 200 lbs Skin Color: Caucasian Hair Color: Gray

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

**Brandon Snesko**
Process Server

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**
**(202)-398-4200**
**info@samedayprocess.com**

Internal Job ID:248697



District of Columbia: SS
Subscribed and Sworn to before me
this ___ day of _____, 2019

_____
K. Mack, Notary Public, D.C.
My commission expires February 29, 2024

## AFFIDAVIT OF PROCESS SERVER

### United States of America Federal Trade Commission

**In RE: Stephen Bannon**

,

VS.

.

Attorney: Linda Kopp

Federal Trade Commission
Division of Privacy & Identity Protection, 600
Pennsylvania Ave., NW
Washington DC 20580



**\*248698\***

**Case Number: FTC Matter No. 192 3240**

Legal documents received by Same Day Process Service, Inc. on **11/13/2019** at **2:58 PM** to be served upon **Stephen Bannon at 210 A St., NE, Washington, DC 20002**

I, **Rene Rivas**, swear and affirm that on **November 14, 2019** at **10:45 AM**, I did the following:

**Personally** Served **Stephen Bannon** the person listed as the intended recipient of the legal document with this **Letter (undated); Civil Investigative Demand; Federal Trade Commission ("FTC") Civil Investigative Demand ("CID") Schedule; Federal Trade Commission - Bureau of Consumer Protection - Production Requirements** at **210 A St., NE , Washington, DC 20002**.

**Description of Person Accepting Service:**
Sex: Male Age: 65 Height: 5ft9in-6ft0in Weight: Over 200 lbs Skin Color: Caucasian Hair Color: Gray

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

**Rene Rivas**
Process Server

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**
**(202)-398-4200**
**info@samedayprocess.com**

Internal Job ID:248698

District of Columbia: SS
Subscribed and Sworn to before me
this _15_ day of _NOVEMBER_ 2019

_____
K. Mack, Notary Public, D.C.
My commission expires February 29, 2024

# Petition Exhibit 4

Letter from Maneesha Mithal to Alex Spiro

(November 21, 2019)



United States of America
## FEDERAL TRADE COMMISSION
WASHINGTON, DC 20580

Maneesha Mithal, Esq.
Bureau of Consumer Protection
Division of Privacy and Identity Protection

November 21, 2019

*Via Electronic Mail*

Alex Spiro, Esq.
Quinn Emmanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

Re: *In re Stephen K. Bannon.*, FTC No. 192-3240

Dear Alex:

    This letter modifies the hearing date for the investigational hearing of Mr. Stephen K. Bannon as set forth in the Civil Investigative Demand ("CID") issued to Mr. Bannon on September 24, 2019, in the above referenced matter.  Because Mr. Bannon has not yet produced information and documents responsive to this CID, I am setting January 15, 2020 as the new date for the investigational hearing.  No other aspect of the CID is modified.

*       *       *

    Please call Linda Holleran Kopp at (202) 326-2267 if you have any questions or would like to discuss these matters further.

Sincerely,

Maneesha Mithal
Associate Director

# Petition Exhibit 5

Letter from Maneesha Mithal to Alex Spiro

(August 27, 2020)



United States of America
**FEDERAL TRADE COMMISSION**
WASHINGTON, DC 20580

Maneesha Mithal, Esq
Division of Privacy & Identity Protection

August 27, 2020

*Via Electronic Mail*

Alex Spiro, Esq.
Quinn Emmanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

Re: In re Stephen K. Bannon., FTC No. 192-3240

Dear Alex:

This letter responds to your request to move the hearing date for the investigational hearing of Mr. Stephen K. Bannon as set forth in the Civil Investigative Demand ("CID") issued to Mr. Bannon on September 24, 2019, in the above referenced matter. I have agreed to your request to move the investigation hearing ("IH") to September 29, 2020. Mr. Bannon's IH will begin at 9:00am on September 29, 2020.

I understand that you declined our offer to conduct the IH virtually, preferring instead to participate in-person. This is currently permissible under the District of Columbia's Covid-related rules and our building policies, although you and your client will be required to follow certain safety protocols. Currently, these include taking your temperature before coming to the office on the morning of the IH, answering a health-related questionnaire upon your arrival, and wearing a mask at all times within the office. Mr. Bannon may bring two attorneys to accompany him into the IH. Please contact Ms. Kopp a week prior to the IH to learn of any new or different protocols that must be followed for an in-person IH. Please note that we have reserved a large conference room that will allow each person to sit at least six feet away from each other, although you may sit closer to your client if you prefer.

Please contact Linda Holleran Kopp at (202) 326-2267 if you have any questions or would like to discuss this matter further.

Sincerely,

Maneesha Mithal
Associate Director

# Petition Exhibit 6

Unsealed Indictment against Stephen K. Bannon in
*United States v. Kolfage et al*., 20-CR-412 (S.D.N.Y.)

(August 20, 2020)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :      **SEALED INDICTMENT**

          - v. -                   :      20 Cr.

BRIAN KOLFAGE,                     :
STEPHEN BANNON,                            **20 cr 412**
ANDREW BADOLATO, and               :
TIMOTHY SHEA,
                                   :
          Defendants.
                                   :
- - - - - - - - - - - - - - - - - - X


## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury charges:

### Overview

1.    BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and

TIMOTHY SHEA, the defendants, and others, orchestrated a scheme to

defraud hundreds of thousands of donors, including donors in the

Southern District of New York, in connection with an online

crowdfunding campaign ultimately known as "We Build The Wall" that

raised more than $25,000,000 to build a wall along the southern

border of the United States.   To induce donors to donate to the

campaign, KOLFAGE and BANNON - each of whom, as detailed herein,

exerted significant control over We Build the Wall - repeatedly

and falsely assured the public that KOLFAGE would "not take a penny

in salary or compensation" and that "100% of the funds raised . . .

will be used in the execution of our mission and purpose" because, as BANNON publicly stated, "we're a volunteer organization."

2. Those representations were false. In truth, BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, collectively received hundreds of thousands of dollars in donor funds from We Build the Wall, which they each used in a manner inconsistent with the organization's public representations. In particular, KOLFAGE covertly took more than $350,000 in funds that had been donated to We Build the Wall for his personal use, while BANNON, through a non-profit organization under his control ("Non-Profit-1"), received over $1,000,000 from We Build the Wall, which BANNON used to, among other things, secretly pay KOLFAGE and to cover hundreds of thousands of dollars in BANNON's personal expenses. To conceal the payments to KOLFAGE from We Build the Wall, KOLFAGE, BANNON, BADOLATO, and SHEA devised a scheme to route those payments from We Build the Wall to KOLFAGE indirectly through Non-Profit-1 and a shell company under SHEA's control, among other avenues. They did so by using fake invoices and sham "vendor" arrangements, among other ways, to ensure, as KOLFAGE noted in a text message to BADOLATO, that his pay arrangement remained "confidential" and kept on a "need to know" basis.

2

## Background on We Build the Wall

3.    On or around December 17, 2018, BRIAN KOLFAGE, the defendant, with the assistance of others, launched a fundraising campaign, originally called "We the People Build the Wall," on a crowdfunding website (the "Crowdfunding Website"). According to statements on the webpage for "We the People Build the Wall" on the Crowdfunding Website, the campaign was raising funds to donate to the United States federal government for construction of a wall at the southern border of the United States.  The webpage also stated that "100% of your donations" would be given to the government for the construction of a wall, and that if the campaign could not attain its goal, it would "refund every single penny."

4.    The "We the People Build the Wall" campaign was an immediate fundraising success.   Within the first week, BRIAN KOLFAGE, the defendant, with the assistance of TIMOTHY SHEA, the defendant, raised approximately $17,000,000.  Despite its early success, the campaign also drew scrutiny, including questions about KOLFAGE's background and the campaign's plan to give the money raised to the federal government for the purpose of constructing a wall at the southern border of the United States.

5.    Based on those concerns, in or around December 2018, the Crowdfunding Website suspended the campaign – which by that point had raised more than $20,000,000 – and warned BRIAN KOLFAGE, the defendant, that unless he identified a legitimate

3

non-profit organization into which those funds could be transferred, the Crowdfunding Website would return the funds.

6.    Around the same time, BRIAN KOLFAGE, the defendant, involved STEPHEN BANNON and ANDREW BADOLATO, the defendants, in the leadership of the campaign.  BANNON, a political strategist and former media executive, and BADOLATO, an entrepreneur and venture capitalist, were already working together on Non-Profit-1, which was a separate Section 501(c)(4) organization founded by BANNON with the stated purpose of promoting economic nationalism and American sovereignty.

7.    Within days of becoming involved, STEPHEN BANNON and ANDREW BADOLATO, the defendants, took significant control of the fundraising campaign's organization and day-to-day activities, including its finances, messaging, donor outreach, and general operations.  Specifically, in or around late December 2018, BANNON and BADOLATO, working with BRIAN KOLFAGE, the defendant, oversaw the creation of a new Section 501(c)(4) organization – We Build the Wall Inc. – to which they proposed that the money that had been raised by "We the People Build the Wall" could be transferred.  BANNON, BADOLATO, and KOLFAGE formed We Build the Wall Inc. to continue fundraising activities relating to wall construction, with the modified purpose of funding the *private* construction of a wall along the southern border of the United States.

4

8.    Moreover, BRIAN KOLFAGE, STEPHEN BANNON, and ANDREW BADOLATO, the defendants, made and caused to be made a series of representations and gave assurances to the Crowdfunding Website intended to induce the Crowdfunding Website to release the donor funds to We Build the Wall.    These assurances included, among other things, written bylaws with conflict of interest provisions and compensation restrictions precluding insiders like KOLFAGE, among others, from improperly misappropriating donor funds, and a promise that "Kolfage will take no salary" and "will personally not take a penny of compensation from these donations."   KOLFAGE, BANNON and BADOLATO also agreed that donors would have to "opt in" to having their contribution redirected from the Crowdfunding Website to We Build the Wall.

### The Use of We Build the Wall to Perpetrate the Fraud

9.    Beginning in January 2019, BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, caused We Build the Wall to mislead donors, promising them repeatedly that "100 percent" of the funds would be used for construction of a wall and that KOLFAGE, in particular, would take no salary or compensation from the new organization.    Contrary to the representations both to donors and to the Crowdfunding Website, KOLFAGE, BANNON, BADOLATO, and SHEA worked together to misappropriate hundreds of thousands of dollars of those funds for their own personal benefit.

10. Beginning on or around January 11, 2019, and consistent with the assurances provided to the Crowdfunding Website, We Build the Wall announced that it had changed its mission to the private construction of a wall, and that donors needed to "opt in" to having their donation transferred to We Build the Wall for this purpose. In essence, under We Build the Wall's agreement with the Crowdfunding Website, BRIAN KOLFAGE, STEPHEN BANNON, and ANDREW BADOLATO, the defendants, had to effectively re-raise the approximately $20,000,000 they had already raised from donors by convincing them to "opt in" and thereby permit their donations to be transferred to We Build the Wall.

11. To do so, BRIAN KOLFAGE, STEPHEN BANNNON, and ANDREW BADOLATO, the defendants, caused We Build the Wall to promise donors that "100% of funds raised" would be used toward the construction of a wall, and that not a "penny" would be used to compensate KOLFAGE. That promise was repeatedly made in donor solicitations, public statements, social media posts, and press appearances by KOLFAGE and BANNON, and others acting at KOLFAGE's, BANNON's, and BADOLATO's direction. For example, We Build the Wall's website told prospective donors that, "In accordance with Mr. Kolfage's personal pledge and the Bylaws . . . Mr. Kolfage will not profit even a penny from We Build the Wall Inc." KOLFAGE similarly and repeatedly promised in fundraising solicitation emails, which BANNON and BADOLATO reviewed and approved, that he

6

would "not take a penny in salary or compensation." KOLFAGE posted messages on social media that included representations such as: "We promised 100% of the funds raised on [the Crowdfunding Website] only go towards border wall construction," "All money donated to the [We Build the Wall] campaign goes directly to wall!!! Not anyone's pocket," and "I'm taking nothing! Zero." In fact, KOLFAGE went so far as to send mass emails to his donors asking them to purchase coffee from his unrelated business, telling donors that the coffee company was the only way "he keeps his family fed and a roof over their head," because KOLFAGE was taking "no compensation" from We Build the Wall.

12. KOLFAGE also touted the bylaws that We Build the Wall had ratified at the request of the Crowdfunding Website, saying publicly and in media interviews, for example, "It states in our bylaws I take $0 no salary no compensation," and "I won't take a penny from these donations" and "It's not possible to steal the money. . . . We have an advisory committee. . . . I can't touch that money. It's not for me. We have bylaws set up."

13. BRIAN KOLFAGE, STEPHEN BANNON, and ANDREW BADOLATO, the defendants, and others acting at their direction, approved these statements - which were false - precisely because they understood and expected that donors would rely upon these representations, which were intended to maximize the fundraising potential of We Build the Wall. Indeed, in developing their

7

strategy of emphasizing to donors that KOLFAGE would "not be paid a dime," BANNON and BADOLATO, in a text message exchange, discussed how that message would help drive fundraising and opt-ins by prior donors because it would, as BADOLATO stated, become "the most talked about media narrative ever" since it "removes all self-interest taint" and "gives [B]rian Kolfage saint hood." For that reason, BADOLATO insisted that the statement that KOLFAGE "will not take a penny of compensation" be included in the email to We Build the Wall's donors about the opt-in process, explaining in an email that this statement was a "material item" to donors.

14. Moreover, in addition to statements that BRIAN KOLFAGE, the defendant, would not be "paid a dime," KOLFAGE, STEPHEN BANNON, and ANDREW BADOLATO, the defendants, conveyed that others in the leadership of We Build the Wall and its advisory board (which BANNON chaired) would not be compensated. For example, KOLFAGE wrote on social media, "I thought it was pretty clear. I made a promise that I would NEVER take a penny 100% of fundraising through . . . donations will only go towards the wall. 100% means 100% right? Board won't see any of that money!" Moreover, during interviews and We Build the Wall events, BANNON himself stated, "I did this kind of as a volunteer" and "we're a volunteer organization."

15. Donors took notice of this core narrative and told BRIAN KOLFAGE, the defendant, and others working for We Build the

Wall that it mattered to them.   Some of those donors wrote directly
to KOLFAGE that they did not have a lot of money and were skeptical
about online fundraising campaigns, but they were giving what they
could because they trusted KOLFAGE would keep his word about how
their donations would be spent.   KOLFAGE also wrote to prospective
donors who raised concerns, assuring the donors in private messages
that he was not being compensated.

16.   These false assurances successfully induced donors
to give money to We Build the Wall and to opt in to have their
prior donations transferred to We Build the Wall's new non-profit
entity.   Of the original $20,000,000 raised from hundreds of
thousands of donors, most of the donors agreed to "opt in" and
allow their donations to be transferred to We Build the Wall under
the false premise that "100% of fundraising through . . . donations
will only go towards the wall" and that BRIAN KOLFAGE, the
defendant, would not take any compensation for his work.
Moreover, We Build the Wall continued to raise new funds from
additional donors based on those false representations.   In total,
between the beginning of the "opt in" period in January 2019 and
October 2019, We Build the Wall raised approximately $25,000,000
in new or opted-in donor funds, under the false assurance that
100 percent of money donated would go to construction of the wall.

The Defendants' Self-Enrichment from We Build the Wall's Funds

17. Despite these repeated assurances, the public narrative deliberately crafted by BRIAN KOLFAGE, STEPHEN BANNON, and ANDREW BADOLATO, the defendants, and others, was false. In fact, although We Build the Wall spent money on the construction of a border wall, hundreds of thousands of dollars were siphoned out of We Build the Wall for the personal use and benefit of KOLFAGE, BANNON, BADOLATO, and TIMOTHY SHEA, the defendant. Indeed, despite KOLFAGE's numerous public statements that he was not taking a salary or getting a penny in compensation, within days of launching We Build the Wall, KOLFAGE, working primarily with BANNON and BADOLATO, reached a secret agreement whereby KOLFAGE would be covertly paid "$100k upfront [and] then 20 [per] month." Because that arrangement was directly contrary to the defendants' repeated public representations, KOLFAGE, BANNON, BADOLATO, SHEA, and others schemed to pass these payments to KOLFAGE indirectly from We Build the Wall through third parties, including entities under the control of BANNON and SHEA.

18. To preserve the secrecy of the arrangement to pay BRIAN KOLFAGE, the defendant, with We Build the Wall's donor funds, STEPHEN BANNON, the defendant, agreed to pass payments from We Build the Wall to KOLFAGE through Non-Profit-1, which, as noted above, was controlled by BANNON, with the assistance of ANDREW BADOLATO, the defendant, and others. In approving that

10

arrangement, BANNON made clear in a text message to BADOLATO that there would be "no deals I don't approve," and directed that KOLFAGE be paid indirectly through Non-Profit-1 in an attempt to conceal the payments from the public, notwithstanding the fact that KOLFAGE did no work for Non-Profit-1 and that the payments from Non-Profit-1 to KOLFAGE would be funded by We Build the Wall.

19. Consistent with that scheme, on or around February 11, 2019, STEPHEN BANNON and ANDREW BADOLATO, the defendants, caused Non-Profit-1 to pay BRIAN KOLFAGE, the defendant, $100,000 in funds from We Build the Wall. Text messages exchanged between BANNON and BADOLATO, and others, confirm the payment was intended as a salary for KOLFAGE and that the payment would be funded by We Build the Wall. In particular, in the days prior to the payment, BANNON directed BADOLATO in a text message to send a "wire of cash to [Non-Profit-1]" from We Build the Wall, and shortly thereafter Non-Profit-1's bank account received a $250,000 wire from We Build the Wall. No more than a week later, that same bank account was used to make a $100,000 wire transfer to KOLFAGE. In each of the following two months, BANNON again paid KOLFAGE – each time, a $20,000 monthly salary payment, consistent with the secret deal BANNON had approved, as described above - using funds that had been wired into Non-Profit-1's bank account from We Build the Wall shortly before the payment to KOLFAGE. When KOLFAGE later noted in a text message to BADOLATO

11

that, at least in part as a result of these pass-through payments,
We Build the Wall would have to disclose substantial payments to
Non-Profit-1 on tax forms, BADOLATO replied, "Better than you or
me lol."   To conceal the payments KOLFAGE received from Non-
Profit-1, KOLFAGE instructed BADOLATO that the payments should be
made to KOLFAGE's spouse, and Non-Profit-1 subsequently issued a
Form 1099 falsely stating that it had paid KOLFAGE's spouse for
"media."

          20.  Thereafter, beginning in or around April 2019, and
to further conceal payments of We Build the Wall funds to BRIAN
KOLFAGE, the defendant, his secret monthly salary of approximately
$20,000 was passed indirectly through other third-party entities
that were purported vendors for We Build the Wall, including one
under the control of TIMOTHY SHEA, the defendant.   Starting in or
around March 2019, SHEA – who had been involved in early operations
of the predecessor campaign to We Build the Wall, and was familiar
with We Build the Wall's repeated promises that KOLFAGE, in
particular, would take no salary – proposed, in a text message
exchange with KOLFAGE, paying KOLFAGE and himself out of a "veiled"
shell corporation to conceal the source and nature of the payments.
SHEA suggested that to conceal transactions where, for instance,
"600k comes in and [he] transfers 300k" to KOLFAGE, they could
"create companies that . . . hired [KOLFAGE and SHEA] . . . for a
service," like "consulting."   To further conceal the secret

                                12

arrangement, KOLFAGE later told SHEA in an email that they could falsely describe the payments from the new shell entity to KOLFAGE as for "social media."

21. Consistent with the scheme detailed above, in or around April 2019, TIMOTHY SHEA, the defendant, incorporated an anonymous limited liability corporation ("Shell Company-1"), and then began receiving payments from We Build the Wall, a share of which SHEA then paid over to BRIAN KOLFAGE, the defendant.   For example, on or around April 22, 2019, Shell Company-1 received a $50,000 wire from We Build the Wall, and four days later paid half of that amount to KOLFAGE.   Again, on or around May 21, 2019, Shell Company-1 received a $30,000 wire from We Build the Wall, and on or around June 5, 2019, paid $20,000 to KOLFAGE.   The memo lines on these payments from We Build the Wall to Shell Company-1 falsely stated, as KOLFAGE had suggested, that they were for "social media" accounts and pages when, in fact, neither KOLFAGE nor anyone else had done such work for Shell Company-1.   In each instance, SHEA kept the remaining balances of money.   Moreover, additional $20,000 payments from Shell Company-1 to KOLFAGE, and funded by money from We Build the Wall, were made in subsequent months until at least October 2019, when, as discussed below, the

defendants learned that they might be under criminal investigation.

22. In addition to the payments above, ANDREW BADOALTO, the defendant, also arranged for additional $20,000 salary payments to be made from We Build the Wall to BRIAN KOLFAGE, the defendant, that were passed through bank accounts under the control of two of BADOLATO's associates. First, in or around June 2019, and to pay KOLFAGE's $20,000 salary from We Build the Wall for the month of June 2019, BADOLATO gave a $50,000 check from We Build the Wall to an associate ("Associate-1") purportedly for work done for We Build the Wall. Associate-1 then cashed the check and paid $20,000 of the funds to KOLFAGE, keeping the balance. Additionally, in or around late July and early August 2019, BADOLATO caused We Build the Wall to pay over $150,000 to a construction contractor ("Associate-2"). Associate-2 then paid $70,000 of those funds to KOLFAGE, another $50,000 of those funds to BADOLATO, and $20,000 to an attorney working on a matter for BADOLATO unrelated to We Build the Wall.

23. In total, from the creation of We Build the Wall in January 2019 to in or around October 2019, BRIAN KOLFAGE, the defendant, received more than $350,000 in donor funds from We Build the Wall, all passed indirectly at the direction and with the assistance of STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, through Non-Profit-1, Shell Company-1, and the

14

accounts controlled by Associate-1 and Associate-2.   KOLFAGE then used those funds to pay for his own personal expenses, including, among other purposes, home renovations, payments toward a boat, a luxury SUV, a golf cart, jewelry, cosmetic surgery, personal tax payments, and credit card debt.

24. Moreover, in addition to BRIAN KOLFAGE, the defendant, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, each received hundreds of thousands of dollars in donor funds from We Build the Wall, which they each used to pay for a variety of personal expenses, including, among other things, travel, hotels, consumer goods, and personal credit card debts, in addition to the payments described above to KOLFAGE.   With respect to BANNON, in particular, as noted above, Non-Profit-1 received over $1,000,000 from We Build the Wall, and while some of that money was used to pay KOLFAGE, as detailed above, BANNON used a substantial portion of those donor funds for personal uses and expenses unrelated to We Build the Wall.

25. None of these payments to BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, were ever disclosed to the public.   Instead, the defendants repeatedly and intentionally led the public to believe that none of their donations would be used for the personal benefit of the defendants. Indeed, as KOLFAGE noted to BADOLATO in a text message exchange,

"[a]s far as [the public] know[s] no one is getting paid" and
"[s]alaries will never be disclosed."

### The Defendants' Concealment After Learning of the Criminal Investigation

26. In or around October 2019, BRIAN KOLFAGE, STEPHEN BANNON, and ANDREW BADOLATO, the defendants, and others learned from a financial institution that We Build the Wall might be under federal criminal investigation. The defendants thereafter took additional steps to conceal the fraudulent scheme detailed above. For example, around that time, and in reaction to the potential investigation, KOLFAGE and BADOLATO began using encrypted messaging applications on their phones, and We Build the Wall's website was changed to remove any mention of the promise that KOLFAGE was not being compensated and to add a statement that he would be paid a salary starting in January 2020. KOLFAGE also stopped receiving secret salary payments after this date.

### Statutory Allegations

27. From at least in or around December 2018 up to and including the date of the filing of this Indictment, in the Southern District of New York and elsewhere, BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to

commit wire fraud, in violation of Title 18, United States Code, Section 1343.

28. It was a part and object of the conspiracy that BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KOLFAGE, BANNON, BADOLATO, SHEA, and others known and unknown, agreed to make and caused to be made false statements to donors that 100 percent of the funds donated to We Build the Wall would be used for construction of a wall at the southern border of the United States, and that none of the money donated would be used to compensate KOLFAGE.

29. It further was a part and object of the conspiracy that BRIAN KOLFAGE, STEPHEN BANNON, and ANDREW BADOLATO, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and

17

fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KOLFAGE, BANNON, BADOLATO, and others known and unknown, agreed to make and caused to be made false statements to the Crowdfunding Website about their intended use of donated funds and their intent to implement and adhere to internal controls designed to prevent the misappropriation of money in order to cause the Crowdfunding Website to release donor funds held by the Crowdfunding Website to the defendants.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

30. The Grand Jury incorporates the allegations contained in paragraphs 1 through 26 of this Indictment as though fully set forth herein.

31. From at least in or around December 2018 up to and including the date of the filing of this Indictment, in the Southern District of New York and elsewhere, BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, and

others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

32. It was a part and an object of the conspiracy that BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, and others known and unknown, in an offense involving interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, wire transfers and checks, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, the conspiracy to commit wire fraud alleged in Count One of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control, of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

33. It was a further part and an object of the conspiracy that BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, and others known and unknown, within the United States, knowingly would and did engage and attempt to engage in monetary transactions in criminally derived

19

property of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, the conspiracy to commit wire fraud alleged in Count One of this Indictment, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

### FORFEITURE ALLEGATIONS

34. As a result of committing the offense alleged in Count One of this Indictment, BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense and the following specific property:

a.   Any and all funds contained in FirstBank account number 2021299187 held in the name of WeBuildtheWall, Inc.;

b.   Any and all funds contained in Capital One account number 3027095806 held in the name of WeBuildtheWall, Inc.;

c.   Any and all funds contained in Bank First account number 18038943 held in the name of WeBuildtheWall, Inc.;

d.    Any and all funds contained in Wells Fargo Bank account number 3536261401 held in the name of Citizens of the American Republic;

e.    Any and all funds contained in US Bank account number 103685954630 held in the name of Ranch Property Marketing & Management LLC;

f.    Any and all funds contained in Wells Fargo Bank account number 3033354584 held in the name of Freedom Daily LLC;

g.    Any and all funds contained in PenFed Credit Union account number 7218209026 held in the name of Brian Kolfage;

h.    Any and all funds contained in Bank First account number 3746617009 held in the name of America First Medical LLC;

i.    Any and all funds contained in Capital One account number 18046276 held in the name of America First Medical LLC;

j.    Any and all funds contained in SunTrust Bank account number 1000212076664 held in the name of White Knights & Vultures LLC;

k.    Any and all funds contained in US Bank account number 103682158292 held in the name of Timothy Shea;

l.    The real property described as a 2019 Jupiter Marine boat named "Warfighter"; and

m.    The real property described as a 2018 Land Rover Range Rover with vehicle identification number SALGS5RE9JA500442.

21

35. As a result of committing the offense alleged in Count Two of this Indictment, BRIAN KOLFAGE, STEPHEN BANNON, ANDREW BADOLATO, and TIMOTHY SHEA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the specific property enumerated in paragraph 34(a) through (m).

Substitute Assets Provision

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendants: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code,

22

Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

AUDREY STRAUSS
Acting United States Attorney

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

BRIAN KOLFAGE,
STEPHEN BANNON,
ANDREW BADOLATO, and
TIMOTHY SHEA,

Defendants.

SEALED INDICTMENT

20 Cr.

18 U.S.C. §§ 1349 and 1956(h)

AUDREY STRAUSS
Acting United States Attorney

A TRUE BILL



Foreperson.

# <u>Petition Exhibit 7</u>

Letter from William Burck to Linda Holleran Kopp

(September 3, 2020)

**Filed Temporarily Under Seal**

# Petition Exhibit 8

Email from Linda Holleran Kopp to
Allison McGuire, Alex Spiro, and William Burck

(September 4, 2020)

**Filed Temporarily Under Seal**

# Petition Exhibit 9

Letter from William Burck to Linda Holleran Kopp

(September 15, 2020)

**Filed Temporarily Under Seal**

# Petition Exhibit 10

Email from Linda Holleran Kopp to
Allison McGuire, Alex Spiro, and William Burck

(September 22, 2020)

**Filed Temporarily Under Seal**

# Petition Exhibit 11

Letter from William Burck to Linda Holleran Kopp

(September 28, 2020)

**Filed Temporarily Under Seal**